**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF VERMONT**

| | |
|---|---|
| **Carrie Bishop**, individually; **Greg Bishop**, individually; and **A.B.**, by and through her parents and natural guardians, Carrie and Greg Bishop,<br><br>Plaintiffs,<br><br>v.<br><br>**Zoie Saunders,** in her official capacity as Secretary of the Vermont Agency of Education; **Tammy Kolbe**, in her official capacity as Chair of the Vermont State Board of Education; and **Barstow Unified Union School District**,<br><br>Defendants. | Case No. 2:26-cv-00404-gwc<br><br>**Verified Complaint** |

## INTRODUCTION

1. This case seeks to end Vermont's and its local school districts' continuous discrimination against religious families and schools.

2. Vermont is sparsely populated and many families live in school districts that don't actually operate a school.

3. Instead, those school districts pay the tuition for their resident-students to go to school at a different public or private school—a system called the Town Tuition Program.

4. The Bishops live in the Barstow Unified Union School District, which doesn't have a high school. A.B. just started her senior year of high school.

5. Vermont also offers a Dual Enrollment Program that allows high schools students to take college courses at no cost to them.

6. Eligibility for Dual Enrollment is contingent on Town Tuition: a student must either be in a public school or receiving Town Tuition funding at a private school to be eligible.

7. Historically, the State categorically excluded religious schools and their families from the Town Tuition and Dual Enrollment Programs.

8. In 2021, the Second Circuit put an end to that unconstitutional religious discrimination, holding that religious schools were "entitled to [Town Tuition] funding to the same extent as parents who choose secular schools for their children, regardless of [their] religious affiliation or activities." *In re A.H.*, 999 F.3d 98, 108 (2d Cir. 2021) (*French II*).

9. The same year, the Second Circuit also held that students at religious schools could not be excluded from Vermont's Dual Enrollment Program. *A.H. by & through Hester v. French*, 985 F.3d 165, 184 (2d Cir. 2021) (*French I*).

10. After those decisions, the Vermont Agency of Education and Barstow Unified Union School District tried to limit funding to religious schools by saying that funds could not go toward religious "uses" such as religious instruction or worship.

11. In fact, Defendant Barstow Unified Union School District refused to follow the law after *French I* and *II* and continued to partially deny Town Tuition funding to families attending Mount St. Joseph Academy because the School District said it could not allow funds to be used for “religious worship or education.” V. Compl. at 20–21, *E.W. v. French*, No. 2:22-cv-59 (D. Vt. Feb. 24, 2022), 2022 WL 845700, ECF 1 (*French III*).

12. But then the Supreme Court decided *Carson v. Makin*, holding that the government could not exclude the religious from public benefits based on their “anticipated religious use of the benefits.” 596 U.S. 767, 789 (2022).

13. The lesson for Vermont and local school districts from *French I*, *II*, and *Carson* was clear: stop excluding religious schools and the families that want to go to those schools from the Town Tuition and Dual Enrollment Programs. But they did not listen.

14. Last year, Vermont enacted Act 73, a new law that puts all of Vermont’s religious schools and their families right back where they were before *French I*, *II*, and *Carson*: no religious schools qualify and no religious families that desire religious education can reap the benefits of their own tax dollars.

15. Section 21 of Act 73 excludes all religious schools through more subtle, yet no less unconstitutional, criteria that create a religious gerrymander.

16. Those new criteria pertain to geographic location, a ratio of publicly funded students tethered to the first full year religious schools became eligible, and class sizes.

17. Under Act 73, to be eligible for Town Tuition, some—but not all—private schools must: (1) be located in a school district (or supervisory union with a school district) that does not operate a public school; (2) have had at least 25% of its enrollment composed of publicly funded students during the 2023–2024 school year; and (3) comply with minimum class-size requirements regardless of school size.

18. Together, these three requirements create a de facto religious exclusion that cuts out all religious schools from the Town Tuition Program. That exclusion is called the "Religious Exclusion."

19. What's more is that the new criteria have absolutely nothing to do with Act 73's overarching purported goal of consolidating Vermont's *public schools* through State-mandated school district consolidation.

20. Worse than that, this year, the Vermont legislature completely abandoned State-mandated school district consolidation, instead allowing school districts themselves to explore and consider "district-led mergers." *See Education Transformation*, Vermont Agency of Education, https://perma.cc/TEA5-4HSU; *see also* 2026 Vt. Acts & Resolves No. 170.

21. Between Act 73 and Act 170, what is left is a piecemeal, arbitrary, and irrational attempt to fix Vermont's public schools, but which has the unconstitutional effect of kicking out religious schools and families from Vermont's public benefit programs.

22. And myriad public statements from Vermont officials between the time *Carson* was decided and Act 73 passed further confirm that religious families and schools were in the crosshairs.

23. The Bishops—along with all of Vermont's religious schools and the sending district families that want to go to those schools—are the victims of Vermont's latest recipe of religious discrimination.

24. A.B. just started her senior year at Mount St. Joseph Academy, one of the religious schools that is now excluded due to the Religious Exclusion.

25. Defendants recently denied A.B.'s request for Town Tuition funding at Mount St. Joseph.

26. Plaintiff A.B. also intended to participate in the Dual Enrollment Program this year, but cannot due to Defendants' Town Tuition denial. A.B. will participate in the Dual Enrollment Program for the spring 2027 semester if this Court orders an injunction allowing her to participate while at Mount St. Joseph.

27. The Bishops are thus being treated as second-class and are suffering ongoing, irreparable harm.

28. This Court should order injunctive and declaratory relief ending Defendants' ongoing religious discrimination so that A.B. can participate in the Town Tuition and Dual Enrollment Programs during her last year of school.

## JURISDICTION AND VENUE

29. This action raises federal questions under the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

30. This Court has original jurisdiction over the claims asserted in this Complaint under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a).

31. This Court has authority to award the requested (1) declaratory relief under 28 U.S.C. § 2201 & 2202 and Fed. R. Civ. P. 57; (2) injunctive relief under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and (3) damages, costs, and attorney's fees under 42 U.S.C. §§ 1983 and 1988.

32. Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, the effects of the challenged law are felt here, Defendants reside here, and Defendants can and do perform official duties here.

## PARTIES

33. Plaintiffs Carrie Bishop and Greg Bishop are husband-and-wife who live in North Chittenden, Vermont.

34. Plaintiff A.B., a minor, is Carrie's and Greg's youngest daughter. She lives with them in North Chittenden.

35. Carrie and Greg sue individually on their own behalf, and on behalf of A.B.

36. Defendant Zoie Saunders is the Secretary of the Vermont Agency of Education.

37. Secretary Saunders' duties include supervising and directing the execution of laws relating to public schools and ensuring compliance with such laws. 16 V.S.A. § 212.

38. Secretary Saunders is responsible for supervising the expenditure and distribution of all money appropriated by Vermont for public schools under Title 16 of the Vermont Statutes. *Id.*

39. Secretary Saunders, as head of the Vermont Agency of Education, has directed and approved the publication of the Agency of Education's Independent School Directory, which categorizes and classifies non-public schools in Vermont. *See Independent School Directories*, Vermont Agency of Education, a true and correct copy of which is attached as Exhibit 1 (includes the directory from February 2025 and the directory from September 2026).

40. Defendant Tammy Kolbe is the Chair of the Vermont State Board of Education, which has supervision over, and management of, the Agency of Education.

41. Defendant Kolbe was previously the Vice Chair of the Vermont State Board of Education while Jennifer Samuelson was Chair. Former Chair Samuelson resigned last month and Defendant Kolbe became Acting Chair. The board officially elected Defendant Kolbe as Chair this month.

42. The State Board of Education "act[s] in accordance with legislative mandates," *id.* § 164, and has authority to make final decisions about Town Tuition disputes, *id.* § 828(c).

43. Defendants Saunders and Kolbe are sued in their official capacities.

44. Defendants Saunders and Kolbe are collectively referred to as "the State" unless the context indicates otherwise.

45. The State decides which schools are approved as "independent schools" and has the authority to enforce compliance with the law by stripping public funding from school districts.

46. Defendants Saunders and Kolbe—through the Agency and Board of Education—enforce and apply Act 73, including the provisions that exclude religious schools, like Mount St. Joseph Academy, from the Town Tuition Program.

47. Defendant Barstow Unified Union School District is "a body politic and corporate with the powers incident to a municipal corporation" and in its name "may sue and be sued." 16 V.S.A. § 713(d); *id.* § 701.

48. Defendant Barstow Unified Union School District bears responsibility for providing education to children who live within its district, including A.B. *Id.* § 822(a)(1).

49. Defendant Barstow Unified Union School District bears the legal burden of funding an education for students who reside in the district, including A.B. *Id.* § 824(a).

50. Defendant Barstow Unified Union School District operates only one public school within its district, the Barstow Memorial School, serving students in grades Pre-K–8.

51. Defendant Barstow Unified Union School District does not maintain a public high school (grades 9–12) and therefore pays tuition for resident students to attend high school elsewhere.

52. Last school year, Defendant Barstow Unified Union School District paid tuition for several dozen high school students to attend elsewhere, including at schools like Rutland High School, Burr & Burton Academy, and Killington Mountain School.

53. Defendant Barstow Unified Union School District denied the Bishops' request for Town Tuition funding for A.B. to attend Mount St. Joseph Academy for the 2026–2027 school year, as explained below.

54. Accordingly, Defendant Barstow Unified Union School District also enforces provisions of Act 73 as it relates to the Town Tuition Program.

## STATEMENT OF FACTS

### A. The Bishops and Their Religious Beliefs and Practices.

55. The Bishops are Christians. Their religious beliefs are rooted in the Holy Bible, which they believe to be the one true, authoritative, inerrant Word of God.

56. In everything they do—from work to school and everything in between—the Bishops follow their Christian beliefs and teachings.

57. Part of those religious beliefs is the belief that Carrie and Greg, as parents, hold the primary responsibility to raise and educate their children according to their Christian faith.

58. Carrie and Greg view this as a religious mandate: they believe they have a responsibility ordained by God to raise their children to learn and understand the Bible, its teachings, and its commandments—chief among them the Gospel of Jesus Christ—and to model, exemplify, and live out those biblical beliefs.

59. Carrie's and Greg's belief that they are to instruct and raise up their children in-line with their faith is rooted directly in the Bible.

60. For example, the Book of Proverbs says to "[t]rain up a child in the way he should go; even when he is old he will not depart from it." *Proverbs* 22:6 (ESV).

61. In the Book of Genesis, God says that he had "chosen" Abraham, "that he may command his children and his household after him to keep the way of the Lord by doing righteousness and justice … ." *Genesis* 18:19 (ESV).

62. After giving the Israelites the Ten Commandments, Moses relayed the Greatest Commandment to his people: "You shall love the Lord your God with all your heart and with all your soul and with all your might. And these words that I command you today shall be on your heart. You shall teach them diligently to your children, and shall talk of them when you sit in your house, and when you walk by the way, and when you lie down, and when you rise." *Deuteronomy* 6:5–7 (ESV).

63. The Apostle Paul, writing to the church in Ephesus, instructed Fathers to "bring [their children] up in the discipline and instruction of the Lord" and instructed children to "obey [their] parents in the Lord, for this is right." *Ephesians* 6:1, 4 (ESV); *see also Colossians* 3:20–21 (ESV) (similar).

64. In short, Carrie and Greg believe they have a religious obligation to instill in their children the Christian beliefs that they follow and profess.

65. For Carrie and Greg, this task does not apply only within their own home. Rather, they believe this religious mandate extends to *everything* in life—from church to school, sports, clubs, friend-groups, jobs, and social life.

66. To this end, Carrie and Greg not only teach their faith to their children at home, but take them to church, place them in Christian youth groups, send them to Christian camps, and, most relevant here, send them to a school that shares their same religious beliefs and practices.

67. The Bishops' two oldest children—their two sons—attended Mill River High School. The Bishops sent their sons there for several reasons. For one, at that time, religious schools were categorically ineligible for Town Tuition funding and the Bishops could not afford to pay tuition out-of-pocket for them to attend a private Christian school. For another, Carrie and Greg believed—at that time—that sending them to public school would not hinder or undermine their ability to raise their sons in accordance with their faith.

68. Yet public schools have since changed and Carrie and Greg took a different approach with their younger three daughters.

69. Carrie and Greg learned from sending their sons to public school that public schools were growing increasingly more antagonistic and hostile to their religious beliefs and much of what they taught contradicted what Carrie and Greg taught at home.

70. For example, their sons faced backlash and scrutiny for taking their Bibles to public school with them.

71. To fulfill their religious mandate to raise their daughters in-line with their faith, the Bishops homeschooled their daughters through eighth grade and then sent all three to Mount St. Joseph for high school.

72. The Bishops homeschooled their daughters through 8th grade because they believed that was the best way to fulfill their religious mandate to raise their children in the Christian faith.

73. The Bishops believed that they would have failed their religious obligation to raise their daughters in the faith if they sent them full-time to a secular public or private school.

74. The Bishops objected (and still object) to sending their daughters full-time to secular school for many reasons.

75. For one, secular schools do not educate from a Biblical worldview perspective.

76. Secular schools do not teach from the Bible; do not proclaim or share the Gospel of Jesus Christ; do not require students to participate in prayer, chapel, and similar religious gatherings; do not celebrate Christian holidays like Christmas and Easter (at least, not in the same way as Christians); do not filter what they do through the lens of the Christian faith; and do not have policies and practices based on Christian tenets.

77. For another, secular schools often teach and proclaim the opposite of what the Bishops believe.

78. As one example, the Vermont Agency of Education has instructed public schools to conceal and facilitate students' purported gender changes, including by requiring staff to address such students "by the name and pronoun corresponding to their gender identity" and allowing students to use locker rooms and restrooms based on their self-claimed "gender identity," not based on biological sex. *Continuing Best Practices for Schools Regarding Transgender and Gender Nonconforming Students* at 5–6, Vermont Agency of Education, a true and correct of which is attached as Exhibit 2.

79. This view that one can "change" their sex conflicts with the Bishops' religious teaching that sex is immutable and God-given.

80. Such conflicts in public schools between secular and religious views on the issue are common. *See, e.g.*, *Mahmoud v. Taylor,* 606 U.S. 522 (2025); *Mirabelli v. Bonta*, 607 U.S. 492 (2026).

81. As another example (and as the Bishops learned from sending their sons to public school) public schools teach evolution, which conflicts with the Bishops' religious teachings that God created the universe in seven days.

82. In furtherance, and as an exercise, of their religious beliefs, the Bishops chose to send their daughters to Mount St. Joseph for high school, because the school teaches and professes the same Christian beliefs that the Bishops teach and profess at home.

83. Mount Saint Joseph is a private Catholic high school serving grades 9–12 in Rutland, Vermont.

84. In 1882, the Sisters of St. Joseph in the Rutland community opened Mount St. Joseph Academy as an all-girls schools. In 1927, the school opened as a co-educational academy. *About MSJ*, Mount St. Joseph Academy, https://perma.cc/D4JD-FC2K.

85. The "core mission of Mount St. Joseph Academy" is to "educate the whole person in mind, body, and spirit" and it does so through its distinctly Catholic education. *Id.*

86. "Developing Faith" at Mount St. Joseph is an essential focus of the school. *Developing Faith at MSJ*, Mount St. Joseph Academy, https://perma.cc/2HAV-LBAT. The school instructs students in the "moral certainty of faith" and how it is the "foundation of a successful life." *Id.* The school's goal is for students "to experience real growth in their faith," and "through that faith, [to] love God and neighbor." *Id.*

87. And the school creates "a religious and moral environment where young people grow to a faith-filled, Catholic Christian maturity that helps them to achieve personal wholeness and to prove effective service to others." *2026–2027 Student/Parent-Guardian Handbook* at 3, Mount St. Joseph Academy, a true and correct copy of which is attached as Exhibit 3 ("MSJ Handbook").

88. The school is "centered in the religious education, spiritual development and faith formation of all students." MSJ Handbook at 4.

89. All students at Mount St. Joseph are thus expected “to participate in Catholic faith experiences, including (but not limited to): Mass, prayer services, retreats, ministry events, daily prayer and service experiences.” *Id.*

90. Although the Bishops are non-denominational Christians and not Catholic, they share and follow the same core Christian beliefs as Mount St. Joseph.

91. For the Bishops, the Christian education and community at Mount St. Joseph is an extension of, and facilitates, what they teach their children at home.

92. A.B. is Carrie’s and Greg’s youngest child. She just started her senior year at Mount St. Joseph Academy.

93. A.B. shares the same Christian beliefs as her parents.

94. A.B. attends Mount St. Joseph as an exercise of her religious beliefs and because of its distinctly Christian education and environment.

## B. Vermont’s Town Tuition and Dual Enrollment Programs.

***Town Tuition Program.***

95. In Vermont, some school districts do not operate public high schools. Under Vermont’s Town Tuition Program, these districts use public funds to pay for students residing in the district to attend independent (private) schools or public schools elsewhere.

96. Specifically, Vermont school districts must either maintain their own high school or “provide for the high school education of its students by paying tuition to a public high school, an approved independent high school, or an independent school meeting education quality standards, to be selected by the

parents or guardians of the student, within or outside the State." 16 V.S.A. § 822(a)(1).

97. "Approved independent schools" are private schools that are approved by the State Board, provide a "minimum course of study," and "substantially complies" with statutory and regulatory requirements. *Id.* § 166(b).

98. "Approved independent schools meeting education quality standards" are private schools that meet the above requirements, *id.* § 166(b), and comply with the standards and regulations that apply to Vermont public schools, *id.* § 165(f).

99. Only two approved independent schools meet the education quality standards.

100. The Town Tuition Program was created to give parents flexibility and choice: when a school district doesn't operate a school, the "parents or guardians" of a student choose where to go. *Id.* § 822(a)(1).

101. Indeed, the Vermont legislature recently declared a "School Choice Day," resolving that Vermont's historic tuitioning system "gives parents of all races, incomes, and backgrounds the opportunity to place their child in the most suitable learning environment for that child, giving the child the best chance to succeed in school and later in life" and that "competition for school choice has been shown to provide a valuable incentive for all schools to meet diverse educational needs, thus better serving all students." Act R-40 (H.C.R. 23), 2017-2018 Gen. Assemb., Reg. Sess. (Vt. 2017).

102. The Town Tuition Program is administered by school boards of the individual school districts, but ultimate oversight authority in individual cases is vested in the Vermont State Board of Education. 16 V.S.A. § 828.

103. The State Board supervises and manages Vermont's Agency of Education.

104. The Vermont Agency of Education classifies schools in Vermont, including approved independent schools, and determines whether they are eligible to receive Town Tuition funding or not.

105. Districts that pay tuition for their students instead of maintaining a public high school are called "sending districts."

106. Students that live in sending districts and attend school at a different public school or approved independent school are called "town tuitioned" or "publicly tuitioned" students

107. Under the Town Tuition Program, sending districts directly pay the amount of tuition on behalf of their students to the public school or the private independent school of each student's choice. 16 V.S.A. § 824.

108. Sending districts must pay "the full tuition charged" to students that go to either a "public high school in Vermont or an adjoining state," a school "functioning as an approved area career technical center," or "an independent school meeting education quality standards." *Id.* § 824(b).

109. For Town Tuitioned students that go to an approved independent school, the sending district pays an amount up-to "the average announced tuition of Vermont union high schools for the year of attendance." *Id.* § 824(c).

110. The "average announced tuition" for high schools for the 2026–2027 school year is $22,603.

111. Tuition at Mount St. Joseph is $7,500 per year. The tuition cost charged to families covers only about 35% of the actual cost of educating each student. The cost to families is lowered by the generosity of donors and support from Catholic organizations.

***Dual Enrollment Program.***

112. In addition to the Town Tuition Program, Vermont enacted the so-called "Flexible Pathways Initiative" which offers several public benefits available to Vermont students. *Id.* § 941.

113. The Flexible Pathways Initiative exists to create more postsecondary opportunities for Vermont students and to help increase college retention and completions rates. *Id.* § 941(a).

114. One Flexible Pathways Initiative Program is the Dual Enrollment Program, which helps high school students obtain college credit.

115. Vermont's Dual Enrollment Program permits students in grades 11 or 12 to take up to two postsecondary courses while still in high school "for which neither the student nor the student's parent or guardian shall be required to pay tuition." *Id.* § 944(b)(2).

116. Students who wish to participate in the Dual Enrollment Program must be enrolled at either a public school, an approved independent school that is designated as the public secondary school for the student's district of residence, an approved independent school in which the student's district of residence pays publicly funded tuition on behalf of the student, or is home-schooled. *Id.* § 944(b)(1).

117. In other words, students who attend an approved independent school are eligible to participate in the Dual Enrollment Program *if* they are a publicly tuitioned student.

### C. Vermont's History of Religious Discrimination.

***Vermont categorically bars religious schools.***

118. For decades, Vermont banned religious schools and their students from receiving public benefits, including Town Tuition and Dual Enrollment funds.

119. The root of Vermont's religious school ban took several forms: state supreme court decisions interpreting the federal Establishment Clause; a state supreme court decision interpreting Vermont's Compelled Support Clause; Vermont Agency of Education regulations and guidance; and now, complete overhaul of Vermont's Town Tuition Program.

120. But the result always stayed the same: private religious schools could not participate in Vermont's publicly funded education programs.

121. For instance, in 1961, the Vermont Supreme Court held that the South Burlington Town School District, which did not have a high school, violated the federal Establishment Clause by paying tuition for students to attend two Catholic

high schools. *Swart v. S. Burlington Town Sch. Dist.*, 167 A.2d 514, 521 (Vt. 1961), *abrogated by Campbell v. Manchester Bd. of Sch. Dir.*, 641 A.2d 352 (Vt. 1994).

122. For the next 30-plus years, private religious schools could not receive tuition funds from sending school districts.

123. In 1994, the Vermont Supreme Court abrogated *Swart* by applying the now-defunct *Lemon* test to hold that it did not violate the Establishment Clause for a public school district to reimburse tuition for a student who attended an out-of-state Episcopal school. *Campbell,* 641 A.2d at 361.

124. After *Campbell,* sending towns briefly paid tuition to religious schools.

125. That inclusion of religious schools didn't last long.

126. Just a few years later, the Chittenden Town School District—one of the predecessor school districts to Barstow Unified—paid tuition for 15 students to attend Mount St. Joseph.

127. When Chittenden School District approved those tuition payments, the Commissioner of Education terminated state funding to the district, arguing such payments violated Chapter I, Article 3 of the Vermont Constitution, the "Compelled Support Clause." Litigation ensued.

128. The Vermont Compelled Support Clause states that "no person ought to, or of right can be compelled to attend any religious worship, or erect or support any place of worship, or maintain any minister, contrary to the dictates of conscience." Vt. Const., ch. I, art. 3.

129. In 1999, the Vermont Supreme Court agreed with the State (the Department of Education) and held that the school district's payments to Mount St. Joseph violated the Compelled Support Clause. *Chittenden Town Sch. Dist. v. Dep't of Educ.*, 738 A.2d 539, 562 (Vt. 1999).

130. The Vermont Supreme Court equated "religious worship" in the Clause with "religious education" and concluded that tuition payments to religious schools were unlawful unless there were "adequate safeguards against the use of such funds" for religious education. *Id.* at 543, 562.

131. The court thus left the door open for the State to craft such safeguards so that tuition money could be sent to religious schools.

132. Yet the court "express[ed] no opinion on how the State of Vermont can or should address this deficiency should it attempt to craft a complying tuition-payment scheme." *Id.* at 563.

133. The Department of Education never even attempted to address the "deficiency" or to create such safeguards to permit tuition payments at religious schools.

134. Rather, for the subsequent two decades, the Agency of Education directed school districts to deny tuition payments under the Town Tuition Program for students who chose to attend religious schools.

135. Vermont simply categorically excluded all religious schools from public benefits, including the Town Tuition and Dual Enrollment Programs. *French II*, 999 F.3d at 103.

136. As a result, families in sending districts were banned from using Town Tuition funds at religious schools.

137. In 2021, however, the United States Court of Appeals for the Second Circuit held that Vermont's refusal to provide Town Tuition funding to religious schools was unconstitutional. *Id.* at 108.

138. The Second Circuit concluded that religious schools "have been deprived of a public benefit as a result of the state's and the school districts' decades-long policy of unconstitutional religious discrimination" and that religious schools were "entitled to [Town Tuition] funding to the same extent as parents who choose secular schools for their children, regardless of [their] religious affiliation or *activities*." *Id.* (emphasis added).

139. The same year, the Second Circuit also held that excluding religious school students from the Dual Enrollment Program violated the First Amendment. *French I*, 985 F.3d at 184.

***Defendants try to evade* French I *and* II *via a religious-use ban.***

140. But even after the *French I* and *II* decision, neither the State nor Barstow Unified complied and both continued to deny tuition payment requests for students who wanted to attend Mount St. Joseph.

141. Right before *French I* was decided in January 2021, the Secretary of Education, for the first time ever, issued guidance on how to apply "adequate safeguards to ensure tuition payment is not used to 'erect or support any place of worship or maintain any minister.'" *Best Practices for Districts That Pay Tuition to*

*Approved Independent Schools*, Agency of Education, at 1, a true and correct copy of which is attached as Exhibit 4 ("Adequate Safeguards Requirement").

142. In other words, the Agency of Education told school districts that tuition could not be put toward religious uses. *See* Adequate Safeguards Requirement at 3 (requiring religious schools to certify that "public funding will not be expended for worship, religious instruction, or proselytization").

143. The Agency of Education later rescinded the Adequate Safeguards Requirement, but Barstow Unified continue to apply it for students who requested tuition payments at religious schools.

144. During the summer of 2021, Barstow Unified officials applied the Adequate Safeguards Requirement and told a family requesting tuition at Mount St. Joseph that the district would pay tuition *minus any amounts that were to be put toward religious worship or education.*

145. Barstow Unified then paid only a partial tuition payment to Mount St. Joseph for the requesting family and reserved the right to claw back the funds.

146. As a result, the requesting family and the Roman Catholic Diocese of Burlington (on behalf of Mount St. Joseph) sued the State and Barstow Unified in this Court. *French III*, No. 2:22-cv-59 (D. Vt. Feb. 24, 2022).

147. Four months after *French III* was filed, the Supreme Court decided *Carson v. Makin*, holding that the government could not "exclude otherwise eligible schools on the basis of their religious exercise" from public benefits. 596 U.S. at 789.

148. In *Carson,* the Supreme Court held that Maine's tuition assistance program, which was substantially the same as the Town Tuition Program, violated the Free Exercise Clause of the First Amendment. *Id.*

149. Vermont supported Maine at the Supreme Court in *Carson*, arguing it could not "comply with both [the Vermont] constitution" and the Free Exercise "position advanced by" the religious schools there. Vt. Amicus Br., *Carson v. Makin*, 596 U.S. 767 (2022) (No. 20-1088), 2021 WL 5086374, at *1. But Maine lost.

150. *Carson* made clear that governments could not discriminate based on the potential "religious use" of funding: "the prohibition on status-based discrimination under the Free Exercise Clause is not a permission to engage in use-based discrimination." *Carson*, 596 U.S. at 788.

151. Three months later, *after* the 2022–2023 school year started, former Secretary French issued "guidance" to Vermont superintendents explaining that "[i]n light of the U.S. Supreme Court's decision in *Carson v. Makin*, ... [s]chool districts may not deny tuition payments to religious approved independent schools or religious independent schools that meet educational quality standards." Sep. 13, 2022 Guidance from Secretary French at 1, a true and correct copy of which is attached as Exhibit 5.

152. *French III* settled soon thereafter, where the State conceded that *Carson* rendered Vermont's "adequate safeguards" standard unconstitutional.

153. It took several federal lawsuits and a binding Supreme Court decision to force Vermont to treat religious schools equally in the Town Tuition and Dual Enrollment Programs.

154. After years of discrimination, after the 2022–2023 school year started, the State finally said religious schools and families were able to participate in the Town Tuition and Dual Enrollment Programs.

155. But that ability to participate was, again, short lived.

***Vermont officials promise to work-around* Carson *and the State tries to exclude religious schools via nondiscrimination regulations.***

156. Immediately after the *Carson* decision, several Vermont legislators and public officials publicly expressed disdain towards religious schools because Vermont could no longer exclude them from public funding.

157. For example, the same day *Carson* was decided, Rebecca Holcombe—Vermont's Secretary of Education from 2014 to 2018, former candidate for governor, and current state representative—ranted about the decision, complained that religious schools indoctrinate students, and compared the funding of religious schools to church and state relations in Afghanistan:



Rebecca Holcombe
@RHolcombeVT

1/ A few minutes ago, the conservative #SCOTUS majority held that the First Amendment requires Maine's taxpayers to fund explicitly religious education. As @mjs_DC wrote: "This is a breathtakingly radical holding." #vted

11:08 AM · Jun 21, 2022

5 21 35

Post your reply
Reply

Rebecca Holcombe @RHolcombeVT · Jun 21, 2022
2/ This decision has profound implications for #vted and for Vermont's constitutional protections.
I am grateful today for Justice Sotomayor, who wrote: This Court continues to dismantle the wall of separation between church and state that the Framers fought to build...

1 2 17

Rebecca Holcombe @RHolcombeVT · Jun 21, 2022
3/ The consequences of the Court's rapid transformation of the Religion Clauses must not be understated."
For people who care about freedom of conscience and the democratic purpose of public schools, this decision, like #SCOTUS decisions on abortion, is a monumental loss.

1 3 15

Rebecca Holcombe @RHolcombeVT · Jun 21, 2022
4/ In VT, my @vted-ucation property taxes are already increasing in order to fund religious schools that cultivate religious faith in other school districts- including in a school that stigmatizes LGTBQ people I love by equating them to people who practice incest & bestiality.

2 5 11



Rebecca Holcombe @RHolcombeVT · Jun 21, 2022
5/ We already have provisions in state law for statewide public school choice. In addition, private school "choice" districts have the right to designate a subset of schools, including private schools, to serve as the "public schools" for their district.
2 1 7

Rebecca Holcombe @RHolcombeVT · Jun 21, 2022
6/ But when school districts don't do this, taxpayers in other districts have no choice about the fact that their tax dollars now fund religious indoctrination and stigmatization of LGTBQ people (including in schools that exclude students).
2 4 10

Rebecca Holcombe @RHolcombeVT · Jun 21, 2022
7/ I support people's freedom to practice their own beliefs. I also support Vermont's constitutional protection of freedom of conscience, including freedom from compelled support of religion.
1 1 11

Rebecca Holcombe @RHolcombeVT · Jun 21, 2022
8/ But I grew up in places like Afghanistan, and saw first hand the risks of mixing church and state. Separation of church and state protects our ability to work together on shared civic purposes, without hopelessly entangling government in people's individual consciences.
1 2 12

Rebecca Holcombe @RHolcombeVT · Jun 21, 2022
9/ If that weren't enough, over & over, I'm hearing people say that relentlessly rising property taxes threaten their ability to stay in their homes.
Sending our education dollars out of state and to schools with selective enrollment & no public mission makes that problem worse.
2 1 12

Rebecca Holcombe @RHolcombeVT · Jun 21, 2022
10/ It reduces how much we can spend right here at home in our communities on inclusive schools that create a bright future for all our kids.
Are we in this together or not?
VT can't have it both ways.
Public dollars should support public purposes.
#Epluribusunum
#Bettertogether

Rebecca Holcombe (@RHolcombeVT), X (June 21, 2022, at 11:08 ET), https://x.com/RHolcombeVT/status/1539264005327536128.

158. She also retweeted and thanked Rory Thibault—then a candidate for Vermont Attorney General—who unabashedly tweeted that "[p]ublic education funds have no place supporting religious schools that discriminate or push bigotry" and said he would stand with Holcombe "to fight this decision." Rebecca Holcombe

(@RHolcombeVT), X (June 21, 2022, at 10:08 ET), https://x.com/RHolcombeVT/status/1539430002286010370.

159. This wasn't Holcombe's first time attacking religious schools.

160. A few days after the Second Circuit ordered the payment of Town Tuition funds to students at Rice Memorial High School, Holcombe personally called out several Christian schools and implied that funding such schools was part of a "national effort to get taxpayers to fund private, religious education." Rebecca Holcombe (@RHolcombeVT), X (Jan. 28, 2021, at 1:35 ET), https://x.com/RHolcombeVT/status/1354860545166499840.

161. Holcombe further ridiculed religious schools about their sincerely held beliefs on marriage and sexuality. In October 2022, she bragged on X that she "reminded two VT school board members in districts that don't operate high schools that they DON'T have to pay vouchers to homophobic schools"—meaning religious schools that hold fundamental Christian beliefs about marriage. Rebecca Holcombe (@RHolcombeVT), X (Oct. 11, 2022, at 10:17 ET), https://x.com/RHolcombeVT/status/1580019745319157762.

162. Two days later, she again tweeted her idea that school districts could designate certain schools to receive Town Tuition funds, instead of "pay[ing] vouchers to homophobic or exclusionary schools." Rebecca Holcombe (@RHolcombeVT), X (Oct. 13, 2022, at 7:30 ET), https://x.com/RHolcombeVT/status/1580702423613685763.

163. Others backed Holcombe's hostility towards religious schools.

164. State Senator Ruth Hardy also said that religious schools shouldn't receive any public funds and explained how *Carson* made it more difficult to exclude religious schools:

> Unfortunately, because of the actions of the United States Supreme Court [in *Carson*], they have drawn certain lines in the sand that *make it very, very difficult to parse between different types of private schools*. ... So we are in a position where we really, really need to say that we are only providing taxpayer public funds to public schools.

Howard Weiss-Tisman, *Vermont school choice system scrutinized as Legislature responds to U.S. Supreme Court decision*, https://perma.cc/WYD7-B8S5 (emphasis added).

165. While running for office in 2024, Senator Hardy also unequivocally said that Vermont "needs to stop" "subsidizing private and religious schools with public tax dollars." *Ruth Hardy*, VTDigger, https://perma.cc/GLX6-KDAW.

166. After *Carson* and the *French* cases, Vermont officials sought to find an alternative way to exclude religious schools from public benefits.

167. Elected officials debated about how to respond to *Carson* because "the prospect of public dollars going to religious schools [wa]s an uncomfortable one." Peter D'Auria, *What Will Vermont Lawmakers Do About Religious Schools?*, VTDigger (Dec. 28, 2022), https://perma.cc/3QSV-FM68.

168. One proposal was to require sending school districts to designate certain private schools for their students to attend, but that did not come to fruition because it was "unclear that such a model would be able to exclude all religious schools." *Id.*

169. Legislators in both the House and Senate introduced companion bills—H.258 and S.66—both "in response to the U.S. Supreme Court decision [in] *Carson*[.]" Keith Whitcomb Jr., *School choice bills raise concerns, face uncertain political future*, Rutland Herald (Mar. 6, 2023), https://perma.cc/W7H5-PPDC.

170. Senator Hardy, who openly voiced her disagreement with *Carson*, sponsored S.66.

171. Both bills would have eliminated Town Tuition funding for all but a few private secular schools and they ultimately stalled.

172. But elected officials and officials within the Agency and Board of Education pushed onward to exclude religious schools yet again.

173. The next effort involved changes to State Board of Education Rule 2200. That rule series governs the approval process for Vermont's Approved Independent Schools.

174. If a private school is not "approved," then it cannot receive Town Tuition funding.

175. The State amended Rule 2200 to make it more difficult for religious schools to be "approved" and thus to receive Town Tuition funding.

176. The revised rule was a direct response to *Carson* and *French*.

177. This time, instead of barring religious schools from the Town Tuition and Dual Enrollment Programs simply because of their religious identity, Rule 2200 imposed a new nondiscrimination rule on schools seeking approved independent status.

178. Schools seeking to be approved—including private religious schools—had to affirm that they complied with the Vermont Public Accommodations Act and the Vermont Fair Employment Practices Act.

179. That was a problem for many religious schools because those laws prohibited those religious schools' religious based policies on issues like admissions, employment, and operations.

180. For example, the Fair Employment Practices Act prohibits employment discrimination based on "religion," but many, if not all, religious schools employ only people who share that school's particular religious beliefs.

181. As a result of the State Board's new Rule 2200 nondiscrimination rule, at least one Christian school in Vermont—Mid Vermont Christian School—lost its "approved" status for a time, forcing it to file a federal lawsuit.

182. The State knew that many, if not all, religious schools would not be able to affirm compliance with Rule 2200's nondiscrimination rule because they had religiously-based policies that conflicted with them.

### D. Act 73's Perpetuation of Religious Discrimination.

183. State officials and legislators had a back-up plan to exclude religious schools yet again.

184. This time, the State did so by overhauling the entire Town Tuition Program in Act 73, which was signed by Governor Phil Scott on July 1, 2025.

185. Act 73 changes the Town Tuition Program to exclude religious schools from Town Tuition funds.

186. For instance, several legislators made it publicly—and unequivocally—known that they sought to prevent religious schools from receiving such funds.

187. In late 2024, the Friends of Vermont Public Education—a group opposed to funding for private schools—sent a questionnaire to candidates for the Vermont legislature. The questionnaire asked, "Should taxpayer money fund religious schools?" *Candidate Questionnaire,* Friend of Vermont Public Education, https://perma.cc/J5VC-4SP6.

188. Thirty-three candidates (nearly all of them) answered in the negative, despite *Carson* and the *French* cases holding that religious schools cannot be excluded from public benefits.

189. For example, Representative Angela Arsenault said that "the Supreme Court ruling in Carson v. Makin complicates things for us given our tuitioning system in Vermont. We need to figure out how to stop sending public dollars to religious schools" that followed their religiously-based policies.

190. Candidate Kate McCann's answer was loud and clear: "Hell No."

191. Representative Rebecca Holcombe—who previously bashed the *Carson* decision and religious schools—responded "absolutely not" and again insulted the Supreme Court and religious schools. Referring to *Carson*, she exclaimed that "the radical US Supreme Court is threatening the freedom of conscience of VT taxpayers" and the legislature needed "to move aggressively to protect the freedom of conscience of taxpayers." And she said funding religious schools was the same as "funding homophobia" and "discrimination."

192. Representative Troy Headrick also answered "no" and foreshadowed the legislature's gameplan to exclude religious schools, which ultimately would be accomplished by Act 73: "We must amend the process by which religious schools have been included as recipients of Vermont's Town Tuition Program. Given recent federal distinctions, this may not be a straightforward task."

193. These candidates were running to be elected members of the Vermont legislature, in which they would "be bound by Oath or Affirmation, to support th[e] Constitution" of the United States, U.S. Const. art. VI, cl. 3, yet they made clear their intent to violate the Constitution by excluding religious schools.

194. Section 21 of Act 73 creates a religious gerrymander by placing all religious schools in the bucket that is ineligible for Town Tuition.

195. Under Act 73, the following schools remain eligible for Town Tuition without having to meet any new criteria: in-state and *out-of-state* public schools, approved independent schools meeting educational quality standards, tutorial programs approved by the State Board, approved education programs, and therapeutic approved independent schools. Act 73, § 21(a)(1), (2), (3), (4), (5), (6), and (7) (Vt. 2025).

196. But Act 73 imposes new restrictions on approved independent schools only, which the above-listed schools do not have to satisfy.

197. Under Section 21 of Act 73, an approved independent school seeking to participate in the Town Tuition Program must now:

(A) be in Vermont;

(B) been approved as an independent school on or before July 1, 2025;

(C) be "located within either:

(i) a supervisory district that does not operate a public school for some or all grades as of July 1, 2024; or

(ii) a supervisory union with one or more member school districts that does not operate a public school for some or all grades as of July 1, 2024";

(D) had at least 25 percent of its student enrollment composed of publicly tuitioned students for the 2023–2024 school year; and

(E) comply with the minimum class size requirements of 16 V.S.A. § 165(a)(9), unless granted a waiver from the State Board.

*Id.* § 21(a)(2)(A), (B), (C), (D), and (E).

198. Subsection (a)(2)(C) thus imposes a *geographic restriction* on approved independent schools. To be eligible, the school must effectively be located within a "non-operating" school district or supervisory union that contains a "non-operating" school district—*i.e.*, a district that does not operate a public school for some or all grades.

199. The geographic restriction eliminates approved independent schools located in Vermont's more heavily-populated areas.

200. The Bishops' desired school, Mount St. Joseph, is in Rutland, Vermont, within the Rutland City School District, which operates schools for grades K-12.

201. Mount St. Joseph does not satisfy the geographic restriction.

202. Act 73's geographic restriction excludes most religious schools in Vermont because they are located in more heavily-populated areas, such as Burlington and Rutland. And the geographic restriction benefits the large, secular

schools located in Vermont's more-rural areas, such as large private academies like Burr & Burton Academy, St. Johnsbury Academy, Lyndon Institute, and Thetford Academy.

203. For example, Burr and Burton Academy, which enrolls over 700 high school students, is located in the Bennington-Rutland Supervisory Union—a supervisory union which contains three non-operating school districts. Many of Burr and Burton Academy's students are publicly funded and the Academy advertises that families residing in sending districts "do not need any form of financial aid as the sending town tuition is paid through state property taxes." *Tuition and Financial Aid*, Burr & Burton Academy, https://perma.cc/55EJ-CCG2.

204. Similarly, St. Johnsbury Academy enrolls over 600 publicly funded students (over 900 total) and the Lyndon Institute, over 300 publicly funded students (over 400 total). Both are located in non-operating school districts. Alison Novak, *Independent Schools Rebuff School Districts' Request for a Tuition Break*, Seven Days, https://perma.cc/9FGG-XDB7.

205. Subsection (a)(2)(D) imposes a *25% requirement.* To be eligible, 25% of an independent school's enrollment during the 2023–2024 school year must had been publicly funded students.

206. The 25% requirement was tailored for religious schools because it is tied to the 2023–2024 school year, which was the first full school year religious schools were deemed eligible for Town Tuition funding by the State Agency of Education following *Carson v. Makin*.

207. The 25% requirement benefits the approved independent schools that have been able to participate in the Town Tuition Program for several years.

208. The 25% requirement is an arbitrary line that does not further any legitimate governmental purpose.

209. The 25% requirement was created by Vermont legislators so that certain, favored, secular approved independent schools would continue to be able to receive Town Tuition funding and religious schools could not.

210. For example, the first version of the bill passed by the Vermont House of Representatives contained a requirement that approved independent schools needed at least 51% of their student enrollment to be composed of publicly tuitioned students to be eligible for Town Tuition funding.

211. But the threshold was lowered to 25% by a Conference Committee, which included two senators with ties to secular approved independent schools that remain eligible for funding under Act 73.

212. One of those senators, Seth Bongartz (the Chair of the Senate Education Committee), was a longtime board member at Burr and Burton Academy—an eligible school under Act 73.

213. Another senator on the Conference Committee, Scott Beck (the Senate minority leader), is an educator, dorm counselor, and coach at St. Johnsbury Academy—an eligible school under Act 73.

214. In fact, one organization filed ethics complaints with the Vermont Senate against Bongartz and Beck, claiming that they used their positions on the

Conference Committee to ensure their schools received favorable treatment under the new law. Corey McDonald, *Complaints allege Vermont senators with private school ties violated ethics rules during education bill negotiations*, VT Digger (June 30, 2025), https://perma.cc/J8F7-N3JQ.

215. The ethics complaint claimed that Bongartz "fought" to lower the public funding floor from the House bills' 51% down to 25%, to ensure certain approved independent schools remained eligible.

216. None of Vermont's religious schools satisfy the 25% requirement.

217. That's because religious schools in Vermont were categorically barred from participating in the Town Tuition Program for over two decades until the Second Circuit finally ended that discrimination in *In re A.H.*, 999 F.3d 98.

218. Because religious schools could not participate in the Town Tuition Program until after the 2022–2023 academic year started, none were able to build-up their enrollments to reach the 25% requirement just one year later, for the 2023–2024 year.

219. Vermont legislators and officials knew religious schools could not meet the 25% requirement.

220. For example, during one hearing, the Senate Education Committee deliberated a version of the bill that would have allowed tuition to an "independent school located in a bordering state or province" without restriction. H.454, Draft No. 4.1, 2025-2026 Gen. Assemb., Comm. on Educ. (Apr. 24, 2025), https://perma.cc/5NNZ-UGQG.

221. In other words, that version of the bill did not impose the 25% requirement on out-of-state private schools.

222. Senator Ram-Hinsdale said it was "important" that the 25% requirement be added to apply to those schools too because "otherwise we're starting to send people back to religious schools over the border and someone could have a religious school right over the border." Hearing on H.454 Before the S. Comm. on Educ., Apr. 25, 2025, 2025-2026 Reg. Sess. (Vt. 2025) at minute mark 1:51:02–1:52:17 (emphasis added), available at https://www.youtube.com/watch?v=w01PzeEpT0U.

223. No legislator objected.

224. Her comment clearly shows that the 25% requirement was tailored for religious schools—whether in-state or out-of-state.

225. Mount St. Joseph does not satisfy the 25% requirement.

226. Lastly, subsection (A)(2)(E) imposes a *class size requirement*. To be eligible schools must comply with the following minimum class size averages: 10 students for first-grade; 12 students for grade two through five; 15 students for grades six through eight; and 18 students for grades nine through 12. Multiage classrooms for grades kindergarten through eight are also limited to two grade levels per classroom. *See* 16 V.S.A. § 165(a)(9)(A).

227. But the State Board of Education has a mechanism for granting waivers from the class size requirement "due to geographic isolation" or if the school develops "an implementation plan" to meet the requirement. *Id.* § 165(a)(9)(B).

228. The class size requirement thus benefits large approved independent schools, like the historic academies, and penalizes Vermont's religious schools, which typically have smaller class sizes.

229. The class size requirement also categorically exempts several types of classes, such as pre-K, kindergarten, career and technical education, and AP courses, among others.

230. Mount St. Joseph cannot and does not meet the class size requirement.

231. The combination of the geographic restriction, 25% requirement, and class size requirement eliminates any possibility of religious approved independent schools being able to receive Town Tuition funding.

232. The geographic restriction, 25% requirement, and class size requirement operate together as the Religious Exclusion.

233. Act 73 thus creates a gerrymander of religious schools, ensuring that they can no longer receive public tuition funds.

234. Fifteen religious schools[1] were eligible to receive Town Tuition funds during the 2024–2025 school year. *See* Exhibit 1 at 3–13 (listing fifteen religious schools as eligible for public funding as of February 2025).

---

[1] These religious schools are: All Saints Academy, Christ the King (Burlington), Christ the King (Rutland), Good Shephard Catholic School, Grace Christian School, Mater Christi School, Mid Vermont Christian School, Mt. Saint Joseph Academy, Rice Memorial High School, Rutland Area Christian School, Sacred Heart School, St. Francis Xavier, St. Michael's Catholic School, St. Monica-St. Michael School, and St. Paul's Elementary School.

235. Several religious schools received Town Tuition funds during the 2024–2025 school year.

236. Now, because of Act 73, *none* of those 15 religious schools, including Mount St. Joseph Academy, are eligible to receive funding. *See* Exhibit 1 at 35–40 (listing the same fifteen religious schools as ineligible to receive public funds as of September 2026).

237. Yet dozens of secular independent schools remain eligible.

238. This includes 18 favored, secular approved independent schools that remain eligible.

239. In fact, 60% (18/30) of secular approved independent schools that were eligible before Act 73 remain eligible after Act 73. *Compare* Exhibit 1 at 3–13 *with* Exhibit 1 at 35–40 (showing 12 secular approved independent schools moving from "eligible" to "ineligible").

240. In addition, 28 secular "therapeutic approved independent" schools are automatically eligible for tuition funding and exempt from Act 73's geographic restriction, 25% requirement, and class-size requirements.

241. It also includes independent schools meeting education quality standards, tutorial programs approved by the Board of Education, approved education programs, and public schools in other states.

242. At least three approved education programs and four approved tutorial programs thus remain eligible for public funding. *See* Exhibit 1 at 41–42.

243. Religious schools in Vermont cannot become "approved independent schools meeting educational quality standards" because the educational quality standards require the schools to function like a public school, and private religious schools exist to provide an alternative to public schools. The educational quality standards also contain religion-burdening nondiscrimination and DEI rules that religious schools cannot comply with. *See e.g.,* Vt. Admin. Code §§ 7-1-2:2113.2, 7-1-2:2120.

244. The legislature knew from the outset that Act 73 would exclude all religious schools from the Town Tuition Program.

245. For instance, when the House Committee on Education first considered the bill that ultimately became Act 73 (H.454), one representative objected to a statute that allowed the Secretary of Education to "waive" requirements for *recognized* independent schools due to "deep religious convictions." Hearing on H.454 Before the H. Comm. on Educ., Mar. 11, 2025, 2025-2026 Reg. Sess. (Vt. 2025) at minute mark 15:40–17:50, available at https://www.youtube.com/watch?v=cUhb73o943Q.

246. That representative was obviously confused about H.454 because she was citing current law pertaining to recognized schools (and not a proposed change related to the Town Tuition Program). Still, she said we "need to really carefully

examine why we would waive discriminatory [sic] requirements for people with strong religious convictions."[2] *Id.* at 17:24–17:33.

247. In any event, the chair of the committee assuaged her concerns with religious schools, explaining that "the way [the bill] actually defines what private schools would be eligible to be a school choice school, I don't think any [religious school] would qualify any ways." *Id.* at 17:34–46.

248. The objecting representative celebrated, "Okay, great. Good news." *Id.* at 17:46–17:50.

249. According to the Agency of Education's Independent School Directories, the chart below summarizes Act 73's sweeping and gerrymandered impact on Vermont's religious schools:

| | **Pre-Act 73 (as of February 2025)** | **Post-Act 73 (as of September 2026)** |
|---|---|---|
| **Religious Schools Eligible for Public Funding** | 15 | 0 |
| **Secular Private Schools Eligible for Public Funding** | 61 | 46 |
| **Approved Education Programs Eligible for Public Funding** | 5 | 3 |
| **Approved Tutorial Programs Eligible for Public Funding** | 4 | 4 |
| **Out-of-state Public Schools** | No limit | No limit |

[2] Another representative rightly recognized that "the *Carson* case" impacted her objections. *Id.* at 17:00–17:03.

250. The State has said in other similar litigation that Section 21 of Act 73 achieves school consolidation and economies of scale.

251. Section 21 of Act 73 does nothing to consolidate Vermont's public school system, exempts myriad private and public schools, and does not achieve economies of scale (which is undefined).

252. Indeed, the School Redistricting Task Force "conducted a rigorous, data-driven review of Vermont's educational landscape, drawing on statewide fiscal and enrollment data, research from comparable rural states, public input from more than 5,000 Vermonters, and extensive deliberation among members" and found no "evidence that mergers of the scale contemplated in Act 73 would reliably lower costs, improve education outcomes, or expand equity." School District Redistricting Task Force 2025 Report to the General Assembly, available at https://aoa.vermont.gov/school-district-redistricting-task-force.

253. Thus, Section 21 of Act 73 is not rationally related to any legitimate educational interest.

**E. Defendants Deny the Bishops Public Benefits.**

254. Section 22 of Act 73 contains a grandfather clause that allows some students at schools rendered ineligible by the law to receive Town Tuition funding until they graduate:

> A school district that pays tuition pursuant to the provisions of 16 V.S.A. chapter 21 in effect on June 30, 2025 shall continue to pay tuition on behalf of a resident

> student enrolled for the 2024–2025 school year in or who has been accepted for enrollment for the 2025–2026 school year by an approved independent school subject to the provisions of 16 V.S.A. § 828 in effect on June 30, 2025, until such time as the student graduates from that school.

Act 73 § 22 ("Grandfather Clause").

255. So students can receive Town Tuition at an ineligible school until they graduate if they: (a) were enrolled in, and received Town Tuition funding at, an approved independent school during 2024–2025 school year, *or* (b) "ha[d] been accepted for enrollment for the 2025–2026 school year" by such a school.

256. A.B. satisfied both under the Grandfather Clause.

257. A.B. was enrolled in, and received Town Tuition funding at, Mount St. Joseph during the 2024–2025 school year—her 10th grade year.

258. A.B. was also accepted for enrollment at Mount St. Joseph for the 2025–2026 school year, as of June 30, 2025.

259. For the 2025–2026 school year, A.B. decided to do a split program: she would take a Bible class at Mount St. Joseph in the morning and then would finish the rest of her day in the early education program at the Stafford Technical Center.

260. A.B. decided to try the early education program at the Stafford Technical Center for her junior year because she became interested in a career in early childhood education and that program seemed like a good way to prepare her for a future career or higher education in that vocation.

261. The Bishops believed that sending A.B. to the Stafford Technical Center for the vocational early education program did not substantially undermine or interfere with her religious upbringing because it was a specialized, career-

focused program and did not require A.B. to be placed into a traditional, full-time secular school curriculum offered in public schools—precisely the type of secular education and environment the Bishops object to.

262. The Bishops believed it was consistent with their religious convictions for A.B. to try the vocational early education program at Stafford Technical Center. However, had the Bishops learned that the early education program presented religiously-objectionable materials, then they would have dis-enrolled A.B. from the program and enrolled her back at Mount St. Joseph.

263. After the fall 2025 semester started, it was very difficult for A.B. to take classes at both Mount St. Joseph and the Stafford Technical Center due to proximity and scheduling conflicts.

264. Mount St. Joseph and the Stafford Technical Center are several miles apart and A.B. had to travel to Mount St. Joseph in the morning and then find her own transportation to the technical center.

265. A.B. did not drive at that time nor was public transportation an option.

266. After the school year started, due to these scheduling and transportation conflicts, A.B. was forced to temporarily withdraw from Mount St. Joseph and enroll at Rutland High School for her non-vocational training classes because the high school is in the same building as the Stafford Technical Center.

267. For her non-vocational training classes at Rutland High School, A.B. took a semester long "American Voices" class (an American history class focused on

literature) in the morning and quarterly (half-semester) courses in "Piano" and "Career Explorations" in the afternoon.

268. The Bishops believed that it did not substantially interfere with the religious upbringing of A.B. for her to take "American Voices," "Piano," and "Career Explorations"—because those classes did not teach anything inconsistent or contrary to their religious beliefs—but the Bishops would have objected to A.B. having to enroll at Rutland High School full-time for all classes.

269. Although taking those classes at Rutland High School resolved A.B.'s scheduling and transportation issues, it caused other, more severe, issues for A.B.

270. While taking class at Rutland High School during the fall 2025 semester, A.B. fell into depression and struggled emotionally and spiritually.

271. She no longer had the likeminded, supportive religious community that she had while at Mount St. Joseph, she had difficulty making friends and fitting in, and her mental and spiritual health deteriorated.

272. The Bishops thus decided to re-enroll A.B. full-time at Mount St. Joseph as soon as possible, which was immediately after the fall 2025 semester.

273. A.B. re-enrolled at Mount St. Joseph in January 2026 and finished the 2025–2026 school year there.

274. A.B.'s mental and spiritual health greatly improved while back at Mount St. Joseph.

275. During the spring of 2026, Carrie requested Town Tuition funding for A.B. from Defendant Barstow Unified for the 2026–2027 school year.

276. Carrie was told that the school district could not pay for A.B.'s tuition at Mount St. Joseph for the 2026–2027 school year because Mount St. Joseph is ineligible under Act 73's Religious Exclusion and A.B. lost her "grandfather status" when she temporarily withdrew during the fall 2025 semester.

277. Carrie asked then-Vermont Board of Education Chair Jennifer Samuelson for clarification regarding the issue, but she pointed Carrie back to the local school district, telling her that the school district had to officially deny her request.

278. Carrie and Greg attended the June 15, 2025 Barstow Unified Union School Board meeting, told the Board how difficult it was for A.B. during the fall 2025 semester, and asked the Board to strongly reconsider paying Town Tuition for A.B. at Mount St. Joseph because she had been a full-time student there for all but a part of the fall 2025 semester.

279. The next day, the chair of the Barstow Unified School Board pointed to Act 73, noting there was ambiguity in the Grandfather Clause. Roberts Emails at 1, a true and correct copy of which is attached as Exhibit 6.

280. The purported ambiguity centered on one sentence in the Grandfather Clause: "until such a time as a student graduates from that school." The board chair said "others have interpreted that sentence to mean if a student is accepted into a high school by the 30 June 2025 deadline (as your daughter was) their tuition is paid *until they leave*. But the wording of the law says *until they graduate*." *Id.* (emphasis added).

281. The following week, the Barstow Unified Union School Board officially denied the Bishops' Town Tuition request in a special meeting. *See* Barstow Unified Union School Board June 25, 2025 Approved Special Meeting Minutes, a true and correct copy of which is attached as Exhibit 7.[3]

282. The Board admitted that A.B. satisfied the plain text requirements of the Grandfather Clause because she "was enrolled at [Mount St. Joseph] in FY25" and the Clause "say[s] [students] are allowed to stay [at their school] until they graduate." *Id.* at 1–2.

283. But, the Board said, "it has been widely interpreted, even by independent schools, that means, or until they leave." *Id.*

284. During the meeting, one board member even admitted that the "transition rules are written quite poorly, quite honestly."

285. The Board interpreted the "until they graduate" language of the Grandfather Clause to mean, "until they leave the school" and thus decided that because A.B. briefly left Mount St. Joseph for part of the fall 2025 semester, the Grandfather Clause did not apply.

286. Defendant Barstow Unified School District has a policy, practice, or custom of interpreting the Grandfather Clause to mean that students lose eligibility once they leave a school, even though the statutory language does not say that.

---

[3] A recording of the meeting is available via a hyperlink on the Board's website at https://www.rnesu.org/page/district-information-school-boards-barstow-board-meeting-agendas-docs-more.

287. The Barstow Unified School Board has final policymaking authority for the School District and exercised that authority by interpreting the Grandfather Clause as just explained and by unanimously voting to deny the Bishops Town Tuition funding.

288. The Barstow Unified School District made the conscious choice, through its Board, to deny Town Tuition funding to the Bishops even though there were various alternatives, such as deciding to approve Town Tuition funding for the Bishops.

289. In short, the Barstow Board denied the Bishops' request based on its policy, practice, or custom of denying Town Tuition funding to any student—including A.B.—who qualifies under the text of the Grandfather Clause but for the fact that they temporarily left the school they were at.

290. The Bishops initially requested that the State Board of Education review the decision, but due to Act 73's Religious Exclusion, the timing, the fast-approaching school year, and other factors, they ultimately decided not to pursue an administrative hearing.

**F. The Bishops are Suffering Irreparable Harm.**

291. Defendants' enforcement of Act 73's Religious Exclusion—including their interpretation and mis-application of the Grandfather Clause—is causing the Bishops irreparable harm.

292. Defendants' enforcement of Act 73's Religious Exclusion renders the Bishops' desired school—Mount St. Joseph—ineligible for Town Tuition funding.

293. The Bishops could receive Town Tuition funding had they chosen one of the dozens of eligible secular private or public schools.

294. But the Bishops sincerely believe they would violate their religious convictions by placing A.B. back into a secular school full-time because it undermines her religious upbringing.

295. There are no religious school options available for Town Tuition funding under Act 73.

296. Defendants' enforcement of Act 73's Religious Exclusion thus treats the Bishops—and religious families like them—as second-class.

297. Defendants' enforcement of Act 73's Religious Exclusion puts the Bishops to an impossible and unconstitutional Hobson's Choice: (1) abandon their religious beliefs and send A.B. full-time to a secular public or private school to receive Town Tuition funds; or (2) adhere to their religious beliefs and send A.B. to Mount St. Joseph Academy, thereby losing that public benefit and being forced to pay tuition out-of-pocket unlike families that choose an eligible secular school.

298. The Bishops are now forced to pay out-of-pocket for tuition at Mount St. Joseph. Carrie has taken on a second job to help pay for A.B.'s tuition this year. As a result, Carrie has had to spend more time away from home and less time with A.B., thus detrimentally impeding her ability to nurture and raise A.B.

299. Tuition at most of the eligible private secular schools is well over $20,000 per year. *See* Webpages and Chart of Eligible Private Schools' Tuition, a

true and correct copy of which is attached as Exhibit 8.[4] And the average announced tuition rate at public secondary schools is $22,603 per year.

300. In contrast, religious schools overall charge lower tuition rates than public and private secular schools.

301. In addition, A.B. intended to participate in Vermont's Dual Enrollment Program this year.

302. But because Dual Enrollment eligibility is dependent on being "publicly funded"—*i.e.*, receiving Town Tuition funding for private school students—A.B. is now also ineligible for Dual Enrollment.

303. Had Barstow Unified paid Town Tuition funding for A.B., she would have applied for the Dual Enrollment Program.

304. Defendants' enforcement of Act 73's Religious Exclusion is thus also causing the Bishops irreparable harm by denying A.B. the opportunity to participate in the Dual Enrollment Program.

305. A.B. desires and intends to participate in the Dual Enrollment Program for the spring 2027 semester by taking an English course at one of the eligible colleges in lieu of her English curriculum at Mount St. Joseph.

[4] Fourteen of the 18 tuition-eligible approved independent schools have their tuition cost publicly available online. The information in Exhibit 8 was compiled from their webpages.

306. If this Court enters injunctive relief allowing A.B. to enroll in the Dual Enrollment Program for the spring 2027 semester, she will do so and will take a college English course at one of the eligible colleges.

307. Defendants' rejection of A.B. from the Dual Enrollment Program is causing her other harm too.

308. A.B. was recently diagnosed with Hodgkin's Disease, a cancer that affects the lymphatic system, in August 2026.

309. A.B. is undergoing treatment, including chemotherapy. Her treatments sometimes are scheduled during typical school hours.

310. The Dual Enrollment Program allows students to take online classes.

311. Had A.B. been able to participate in the Dual Enrollment Program, she would have been able to take online classes that would have made it easier for her to attend and participate-in due to her cancer treatments. But because she cannot participate in Dual Enrollment, she has missed in-person classes and had to make up coursework after hours.

312. The Bishops are seeking preliminary and permanent injunctive relief against Defendants' enforcement of Act 73's Religious Exclusion so that they can receive Town Tuition funding for the entire 2026–2027 school year and so that A.B. can participate in the Dual Enrollment Program for the spring 2027 semester.

313. Injunctive relief is also needed because retrospective damages from the State are likely barred by sovereign immunity.

## LEGAL ALLEGATIONS

### First Claim for Relief

### Violation of the First Amendment's Free Exercise Clause

314. Plaintiffs incorporate by reference paragraphs 1–313.

315. The First Amendment, incorporated against the States by the Fourteenth Amendment, forbids laws and government action "prohibiting the free exercise [of religion]." U.S. Const. amend. I; *see id.* amend. XIV.

316. Defendants' enforcement of Act 73's Religious Exclusion—including their interpretation and misapplication of the Grandfather Clause—triggers (and fails) the application of strict scrutiny under the Free Exercise Clause of the First Amendment several ways.

317. First, Act 73's Religious Exclusion triggers strict scrutiny under the Free Exercise Clause because it substantially interferes with the Bishops' religious development and upbringing of their daughter A.B.

318. "[F]or many people of faith across the country"—the Bishops included—"there are few religious acts more important than the religious education of their children." *Mahmoud*, 606 U.S. at 547.

319. Carrie and Greg Bishop exercise their religion by raising A.B. in accordance with their Christian faith and guiding the religious development of A.B.

320. One way the Bishops guide the religious development of A.B. is by sending her to a private Christian school that shares their religious beliefs, which is why the Bishops send A.B. to Mount St. Joseph Academy.

321. Similarly, the Bishops guide the religious development of A.B. by abstaining from sending her full-time to a secular private or public school.

322. The Bishops sincerely believe that sending A.B. to a secular private or public school full-time would interfere with and undermine their religious mandate of raising A.B. in the Christian faith because of those schools' secular curriculum and policies as noted above.

323. Sending A.B. to a secular private or public school full time would thus substantially burden the Bishops' religious exercise of raising A.B. in the Christian faith.

324. And "when the government chooses to provide public benefits," as Defendants have done here, the Free Exercise Clause forbids the government from "'condition[ing]' [their] 'availability' on parents' willingness to accept a burden on their religious exercise." *Mahmoud*, 606 U.S. at 561 (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017)).

325. Defendants' enforcement of Act 73's Religious Exclusion does precisely that: they condition the availability of Town Tuition funding and Dual Enrollment participation on the Bishops' willingness to accept a burden on their religious development of A.B. by sending her to a secular school.

326. Act 73's Religious Exclusion excludes all religious schools from the Town Tuition Program. There is thus no Town Tuition option for religious families in Vermont, like the Bishops.

327. Second, Act 73's Religious Exclusion triggers strict scrutiny under the Free Exercise Clause because it is not neutral or generally applicable and burdens the Bishops' free exercise rights.

328. Act 73's Religious Exclusion is not neutral or generally applicable because it treats comparable secular schools (and their families) better than Mount St. Joseph Academy and the Bishops. *Tandon v. Newsom*, 593 U.S. 61 (2021).

329. Act 73's Religious Exclusion is not neutral or generally applicable because its practical "effect" is a religious gerrymander to exclude and penalize all religious schools and families, like the Bishops, while myriad secular private schools and their families remain eligible. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534–36 (1993).

330. Act 73's Religious Exclusion is not neutral because it arises out of, and perpetuates, Vermont's historical discrimination against religious schools and families.

331. Act 73's Religious Exclusion is not generally applicable because Defendant Saunders has discretion to "permit" Town Tuition payments to otherwise *ineligible* schools "in exceptional circumstances." Vt. Admin. Code § 7-1-3:2230.1.

332. Act 73's Religious Exclusion—in conjunction with Defendants' enforcement of the Grandfather Clause—is not generally applicable because it gives the government discretion to make individualized assessments about whether a student meets that requirement or not. *Fulton v. City of Phila.*, 593 U.S. 522 (2021).

333. Act 73's Religious Exclusion—in conjunction with Defendants' enforcement of the Grandfather Clause—is not neutral because A.B. satisfied the plain text requirements of the Grandfather Clause yet Defendants denied her Town Tuition funding anyway.

334. Third, Act 73's Religious Exclusion triggers strict scrutiny under the Free Exercise Clause because it "specifically carve[s] out private religious schools" and their families "from those eligible" to receive Town Tuition and Dual Enrollment funding. *Carson*, 596 U.S. at 780; *see also Espinoza v. Mont. Dep't of Revenue,* 591 U.S. 464 (2020); *Trinity Lutheran*, 582 U.S. 449.

335. The Town Tuition and Dual Enrollment Programs are generally available public benefits.

336. The Free Exercise Clause protects against "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450 (1988).

337. Vermont violates the Free Exercise Clause by excluding the Bishops from the Town Tuition and Dual Enrollment Programs because they selected a religious school.

338. Vermont does not need to subsidize private education, but it continues to do so by allowing dozens of private schools and their families to participate in the Town Tuition Program. Vermont therefore cannot exclude private religious schools and their families from likewise receiving that benefit, "[r]egardless of how the benefit and restriction are described." *Carson*, 596 U.S. at 789.

339. The Bishops would be eligible for those public benefits had they violated their religious convictions and enrolled A.B. full time in one of the many eligible secular private schools or any secular public school.

340. Act 73's Religious Exclusion discriminates against religious schools, their students, and the parents who desire to send their children to those schools.

341. Act 73's Religious Exclusion cannot survive strict scrutiny.

342. Act 73's Religious Exclusion does not serve a compelling governmental interest and is not narrowly tailored to achieve any purported compelling interest.

343. Nor is Act 73's Religious Exclusion rationally related to the supposed legitimate government interests that the government says justify it.

344. In addition, Act 73's Religious Exclusion violates the Free Exercise Clause because it is the product of religious animus and hostility toward religious schools and families that has been ongoing for years.

345. Soon after religious schools finally won in court to participate in the Town Tuition and Dual Enrollment Programs, myriad public officials and legislators made public comments castigating religious schools, suggesting "that religious beliefs and persons are less than fully welcome in [Vermont's educational] community." *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 634 (2018).

346. And school districts, including Defendant Barstow Unified School District, have continued to deny families Town Tuition funding *despite* binding precedent holding that religious schools and families must be able to participate equally.

347. Because Act 73's Religious Exclusion is tainted with religious animus, it is per se unconstitutional. *Id.* at 639.

348. At a minimum, Act 73's Religious Exclusion must face strict scrutiny, which it cannot satisfy.

349. Act 73's Religious Exclusion violates the Free Exercise Clause of the First Amendment.

## Second Claim for Relief

### Violation of the Fourteenth Amendment's Fundamental Parental Right to Control the Upbringing of Children

350. Plaintiffs incorporate by reference paragraphs 1–314.

351. The Fourteenth Amendment prohibits the government from "mak[ing] or enforc[ing] any law which shall abridge the privileges or immunities of citizens of the United States," and from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

352. Among the fundamental rights and liberty interests the Constitution protects is "the [liberty] interest of parents in the care, custody, and control of their children"—"perhaps the oldest of the fundamental liberty interests recognized" by the Court. *Troxel v. Granville,* 530 U.S. 57, 65 (2000) (plurality op.).

353. This fundamental right "without doubt" includes the right of parents to "establish a home and bring up children" and "to control the education of their own." *Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923).

354. Indeed, the Supreme Court recently recognized that "[u]nder long-established precedent, parents—not the State—have primary authority with respect to 'the upbringing and education of children.'" *Mirabelli,* 607 U.S. at 497 (quoting *Pierce v. Society of Sisters*, 268 U.S. 510, 534–535 (1925)).

355. Carrie and Greg Bishop bring this claim to vindicate their fundamental constitutional rights to direct A.B.'s upbringing and education.

356. The Fourteenth Amendment thus protects parents' right to choose a religious education for their children without governmental interference or punishment. *See Pierce v. Soc'y*, 268 U.S. 510; *Wisconsin v. Yoder*, 406 U.S. 205 (1972).

357. Carrie and Greg Bishop exercise this fundamental right by choosing to send A.B. to Mount St. Joseph Academy.

358. Act 73's Religious Exclusion interferes with this right by penalizing the Bishops for picking Mount St. Joseph by denying the Bishops Town Tuition funding that she is legally entitled to under state law.

359. Defendant Barstow Unified Union School District does not have its own high school for its resident students. It has instead elected to fund its students' education elsewhere.

360. Parents who choose to send their children to public schools or secular private schools remain able to receive Town Tuition and Dual Enrollment funding

361. The State thus penalizes Carrie and Greg Bishop for choosing to send A.B. to Mount St. Joseph Academy, burdening their parental rights to direct A.B.'s education and upbringing.

362. Because the State infringes the Bishops' fundamental parental rights, strict scrutiny applies.

363. The State's infringement of the Bishops' fundamental rights cannot survive strict scrutiny because the State lacks a compelling, legitimate, or rational interest and any purported interest is not narrowly tailored.

364. Act 73's Religious Exclusion violates Carrie and Greg Bishop's substantive due process rights and Privileges or Immunities Clause under the Fourteenth Amendment.

## THIRD CLAIM FOR RELIEF

## Violation of the Fourteenth Amendment's Equal Protection Clause

365. Plaintiffs incorporate by reference paragraphs 1–314.

366. The Equal Protection Clause prohibits the government from denying "to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

367. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike" and prohibits the government from creating "arbitrary or irrational" distinctions between classes of people. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 446 (1985).

368. Act 73's Religious Exclusion violates the Equal Protection Clause at least two ways.

369. First, Act 73's Religious Exclusion de facto treats sending district families differently based on a fundamental right: parents' right to select private religious education for their children. *Pierce*, 268 U.S. at 534–35.

370. Parents, like the Bishops, who exercise that fundamental right by picking a private religious school are treated worse than other parents who do not pick private religious schools.

371. Act 73's Religious Exclusion was created with a discriminatory intent towards religious schools and families and results in a discriminatory effect (exclusion) towards religious schools and families.

372. For the State to treat religious schools and families—including Mount St. Joseph Academy and the Bishops—dissimilarly from similarly situated secular schools and families, the State must have a compelling interest and such treatment must be the least restrictive means of achieving that purported interest.

373. The State does not have a compelling reason to justify this disparate treatment of religious schools and the religious families that go to them.

374. Second, Act 73's Religious Exclusion treats approved independent schools and the families that go there differently based on their chosen school's location (via the geographic restriction), publicly-funded enrollment percentages (via the 25% requirement), and class sizes (via the class size requirement).

375. Even when a suspect class or fundamental right is not at issue, the Equal Protection Clause prohibits the government from treating citizens differently from others similarly situated without a rational basis for the differential treatment.

376. The Bishops are similarly situated to all other sending district families in Vermont: both live in districts that do not operate a brick-and-mortar school and thus pay for their students to go elsewhere.

377. But Act 73 treats religious families like the Bishops worse and for no other reason that their chosen schools are in a different geographic area, had a lower ratio of publicly funded students during the 2023–2024 school year, and have smaller class sizes.

378. Act 73's Religious Exclusion—*i.e.*, its geographic, 25%, and class size requirements—is not rationally related to any legitimate government goals and thus violate the Equal Protection Clause.

379. Act 73's purpose is "to ensure each student is provided substantially equal educational opportunities that will prepare them to thrive in a 21st-century world." Act 73, § 1(b)(1).

380. Yet Act 73's disparate treatment of sending district families provides *less* educational opportunities for Vermont students by excluding several approved independent schools—including all religious ones—from being able to receive Town Tuition funding.

381. The discriminatory treatment is not rationally related to Act 73's stated purpose.

382. Act 73's Religious Exclusion violates the Equal Protection Clause.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment against Defendants and order the following relief:

a. A preliminary and permanent injunction, ordering Defendant Barstow Unified Union School District to pay for A.B.'s tuition at Mount St. Joseph Academy for the entire 2026–2027 school year.

b. A preliminary and permanent injunction, ordering Defendants Saunders and Kolbe to permit A.B. to participate in the Dual Enrollment Program for the spring 2027 semester; to pay for A.B.'s Dual Enrollment Program; and to take all actions necessary to facilitate A.B.'s participation in the Dual Enrollment Program.

c. A preliminary and permanent injunction, enjoining Defendants' unconstitutional enforcement of Act 73's Religious Exclusion—via Act 73's geographic restriction (§ 21(a)(2)(C)), 25% requirement (§ 21(a)(2)(D)), and minimum class size requirement (§ 21(a)(2)(E))—so that the Bishops can receive Town Tuition and Dual Enrollment funding.

d. A declaratory judgment that Act 73's Religious Exclusion violates the Free Exercise Clause, the Equal Protection Clause, and the Fourteenth Amendment's protection of fundamental parental rights to direct a child's

upbringing and education.

e. Nominal and compensatory damages against Defendants.

f. Court costs and expenses, including reasonable attorney's fees.

g. Any other relief to which Plaintiffs may be entitled.

Dated: October 27, 2026.

Respectfully submitted,

s/ *David A. Cortman*
David A. Cortman
GA Bar No. 188810
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road, NE
Suite D-1100
Lawrenceville, GA 30043
Telephone: (770) 339-0774
dcortman@ADFLegal.org

Ryan J. Tucker*
AZ Bar No. 034382
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street Scottsdale, AZ 85260
Telephone: (480) 444-0020
rtucker@ADFLegal.org

Mikayla Douglas*
TX Bar No. 24138378
ALLIANCE DEFENDING FREEDOM
7250 Dallas Parkway, Suite 700
Plano, TX 75024
(469) 894-8705
mdouglas@adflegal.org

Jacob E. Reed*
VA Bar No. 97181
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway

Lansdowne, VA 20176
Telephone: (571) 707-4655
jreed@ADFLegal.org

*Attorneys for Plaintiffs*
**Motion for Pro Hac Vice Admission forthcoming*

## VERIFICATION OF COMPLAINT

I, Carrie Bishop, a citizen of the United States and a resident of the State of Vermont, on behalf of myself and my minor daughter, A.B., hereby declare under penalty of perjury that I have read the foregoing Verified Complaint and the factual allegations contained therein, and the facts as alleged are true and correct.

Executed this 19 day of October, 2026 in North Chittenden Vermont.

Carrie L. Bishop

Carrie Bishop

## VERIFICATION OF COMPLAINT

I, Greg Bishop, a citizen of the United States and a resident of the State of Vermont, on behalf of myself and my minor daughter, A.B., hereby declare under penalty of perjury that I have read the foregoing Verified Complaint and the factual allegations contained therein, and the facts as alleged are true and correct.

Executed this 19 day of October, 2026 in N. Chittenden, Vermont.

______________________________

Greg Bishop